

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00426-CV

**IN THE INTEREST OF L.L.Y.B.** and N.N.Y.B., Children

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA00906
Honorable Linda A. Rodriguez, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: December 18, 2024

AFFIRMED

Following a nonjury trial, the trial court terminated the parent-child relationship between C.R.Y.B. and her two young children, L.L.Y.B. and N.N.Y.B.[1] On appeal, C.R.Y.B. argues (1) the evidence is legally and factually insufficient to support each of the statutory grounds for termination; (2) the evidence is legally and factually insufficient to support the best-interest finding; (3) the trial court erred in appointing the Texas Department of Family and Protective Services permanent managing conservator of the children; and (4) she received ineffective assistance of counsel. We affirm.

---

[1]To protect the identity of the minor children, we refer to the children and the parent by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## THE EVIDENCE

At trial, the removing caseworker, Emerald Ramirez, testified the Department's involvement with C.R.Y.B. and the children began in December 2022, when L.L.Y.B. was three years old and N.N.Y.B. was almost a year old. The Department received reports about C.R.Y.B.'s illegal drug use, domestic violence between C.R.Y.B. and her boyfriend, and C.R.Y.B.'s neglectful supervision of the children, including reports that the children would wander outside alone and stay up all night. During this early phase, C.R.Y.B. both admitted and denied that she was using illegal drugs in and out of the children's presence. Further, C.R.Y.B. admitted that during a fight in front of the children, her boyfriend broke her nose. For several weeks, the Department was unable to locate C.R.Y.B. and the children, leading a caseworker to believe C.R.Y.B. was running away from the Department.

After being involved with the family for over six months and having no success convincing C.R.Y.B. to participate in classes to address the Department's concerns, the Department filed the underlying suit to terminate C.R.Y.B.'s parental rights, along with an affidavit in support of emergency removal of the children. On June 15, 2023, the trial court signed an emergency temporary order, appointing the Department the children's temporary sole managing conservator. When the children were removed from C.R.Y.B.'s care, they smelled like urine and had not been bathed. Ramirez said C.R.Y.B. did not have money for diapers. The children were not current on their vaccines and were not receiving regular medical and dental care. At the time of removal, the Department performed hair follicle tests on the children, and the results were positive for methamphetamine.

Another Department caseworker, Kristen Torres, testified that she had prepared a service plan for C.R.Y.B. and had reviewed it with her on August 1, 2023. The service plan required

C.R.Y.B. to obtain and maintain legal employment and housing, engage in and complete parenting classes, complete a drug assessment and follow its recommendations, submit to random drug testing, engage in and complete a domestic violence class, participate in individual therapy, and participate in a mental health assessment and follow its recommendations. Most of the services in the service plan were not completed. Although C.R.Y.B. attended a few parenting classes on domestic violence and its effects on children, she did not complete the course. C.R.Y.B. was unsuccessfully discharged from another parenting course because she attended only three classes. C.R.Y.B. participated in only two individual therapy sessions and she did not complete a mental health assessment. The mental health assessment was especially important because of C.R.Y.B.'s history. Although diagnosed with bipolar disorder in the past, C.R.Y.B. was not taking her medication and managing her condition. Around the time the children were removed, C.R.Y.B. made concerning statements. She stated the children did not speak because they "were possessed with demons." She also stated she had burned L.L.Y.B.'s shirt because she "needed to get the demons out." After removal, Torres tried to talk to C.R.Y.B. about obtaining mental health treatment, but C.R.Y.B. was not receptive to the idea.

Although C.R.Y.B. completed a drug assessment, Torres did not believe C.R.Y.B. was honest about her drug use on the assessment. On August 28, 2023, C.R.Y.B. entered an inpatient drug treatment facility. However, C.R.Y.B. left the facility the same day, claiming she had a contagious skin infection. C.R.Y.B. told Torres she did not know if she was contagious, but she thought she might be. According to Torres, C.R.Y.B. never resumed drug treatment. Once or twice a month, Torres asked C.R.Y.B. to submit to drug testing and C.R.Y.B. almost always refused. Only once—on July 11, 2023—did C.R.Y.B. submit to drug testing. The results of her

hair follicle test were positive for amphetamine, methamphetamine, and cocaine, and the results of her urinalysis test were positive for amphetamine and methamphetamine.

The temporary orders authorized C.R.Y.B. to have weekly supervised visits with the children, but she rarely participated. Her final visit occurred on August 24, 2023. After this visit, C.R.Y.B. told Torres that she had "an infestation of fruit flies in her ear," that she was planning to see the doctor about it, and that she did not want to be around the children because she thought it was contagious. After C.R.Y.B. claimed to be contagious, Torres discussed the matter with the children's attorney ad litem. Both agreed that in the event C.R.Y.B. had some kind of contagious illness, she should not be around the children. Torres told C.R.Y.B. she needed to provide a doctor's note stating she was not contagious before resuming visits. C.R.Y.B. never provided a doctor's note.

C.R.Y.B. never provided Torres with proof that she had obtained employment and housing as required by the service plan. When C.R.Y.B. told Torres she was living with a friend, Torres visited the friend's home multiple times over the span of four months, but C.R.Y.B. was never there. During one visit, the friend told Torres that C.R.Y.B. was living there, but she was not home at the time. During another visit, the friend told Torres that C.R.Y.B. had moved out in early April 2024, and she did not know where C.R.Y.B. was living.

The last contact Torres had with C.R.Y.B. was three weeks before trial. On that day, Torres asked C.R.Y.B. to submit to a drug test, but C.R.Y.B. did not respond to her request. Torres did not know why C.R.Y.B. failed to appear for the trial, but she knew C.R.Y.B. was aware of the trial date because the trial court had announced it in open court while C.R.Y.B. was present. Additionally, Torres sent C.R.Y.B. two texts reminding her about the trial. One reminder

text was sent on the Friday before trial; the other was sent the morning of trial. Nevertheless, C.R.Y.B. failed to attend the termination trial.

After hearing the evidence, the trial court terminated C.R.Y.B.'s parental rights pursuant to section 161.001(b)(1)(N), (O), and (P) of the Texas Family Code. The trial court also found that termination of C.R.Y.B.'s parental rights was in the children's best interest and appointed the Department the children's permanent managing conservator.[2] C.R.Y.B. appealed.

## STATUTORY GROUNDS

To terminate parental rights pursuant to section 161.001, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the children. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*. at 346.

---

[2]The trial court's judgment also terminated the parental rights of the children's fathers and they did not appeal.

**Subsection (N) Finding—Constructive Abandonment**

In her first issue, C.R.Y.B. argues the evidence is legally and factually insufficient to support the predicate ground of constructive abandonment. *See* TEX. FAM. CODE § 161.001(b)(1)(N). To establish constructive abandonment, the Department must prove the children have been in its custody for at least six months and: (1) the Department made reasonable efforts to return the children to the parent; (2) the parent has not regularly visited or maintained significant contact with the children; and (3) the parent has demonstrated an inability to provide the children with a safe environment. *Id*. The reasonable efforts element of constructive abandonment focuses not on the parent's conduct, but on the Department's conduct. *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.). In evaluating this element, "the question is whether the Department made reasonable efforts, not ideal efforts." *In re F.E.N.*, 542 S.W.3d 752, 767 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). "Implementation of a family service plan by the Department is considered a reasonable effort to return a child to [his] parent if the parent has been given a reasonable opportunity to comply with the terms of the plan." *In re A.Q.W.*, 395 S.W.3d 285, 289 (Tex. App.—San Antonio 2013, no pet.), *overruled on other grounds by In re J.M.T.*, 617 S.W.3d 604, 611 (Tex. App.—San Antonio 2020, no pet.) (supplemental op. on en banc reconsideration).

In arguing the evidence is insufficient to support termination under subsection (N), C.R.Y.B. limits her challenge to whether the Department made reasonable efforts to return the children to her. Ample evidence was presented from which the factfinder could have formed a firm belief or conviction that the Department made reasonable efforts to return the children to C.R.Y.B. Immediately after the children's removal, a caseworker prepared a service plan for C.R.Y.B. and reviewed it with her. The service plan, which identified specific services and

service providers for C.R.Y.B. and listed their contact information, included individual counseling services, domestic violence classes, parenting classes, and drug treatment. The service plan was in place and the services remained available for C.R.Y.B. for eleven months. Thus, the evidence showed that C.R.Y.B. was given a reasonable opportunity to comply with the terms of the service plan.

C.R.Y.B. argues the factfinder could not have found the Department made reasonable efforts to return the children because Torres required her to provide a doctor's note before resuming visits with the children. We disagree. Torres required a doctor's note after C.R.Y.B. told her she did not want to be around the children because she might have a contagious condition. The factfinder could have determined that by requiring a doctor's note, Torres was taking appropriate action to protect the children from contracting a contagious condition. The factfinder also could have determined this action did not detract from the other efforts the Department made to return the children to C.R.Y.B., that is, the implementation of a service plan and a reasonable opportunity to comply with it.

After reviewing the evidence under the appropriate standards of review, we conclude the factfinder could have reasonably formed a firm belief or conviction that the Department made reasonable efforts to return the children to C.R.Y.B. The evidence is therefore legally and factually sufficient to support termination under subsection (N).

**Subsection (O) Finding—Non-Compliance with Court-Ordered Service Plan**

In her second issue, C.R.Y.B. argues the evidence is legally and factually insufficient to support the trial court's finding that she failed to comply with the provisions of a court-ordered service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(O). Subsection (O) allows for termination of parental rights if the trial court finds by clear and convincing evidence that the parent "failed to

comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship" of the Department "for not less than nine months as the result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *See id.*

In her brief, C.R.Y.B. argues the evidence is insufficient to support the trial court's subsection (O) finding because she substantially complied with her service plan. "Courts take a strict approach to subsection (O)'s application." *In re E.G.K.*, No. 04-22-00681-CV, 2023 WL 2777510, at *4 (Tex. App.—San Antonio Apr. 5, 2023, no pet.). "Substantial compliance with a court ordered service plan does not constitute compliance under subsection (O), and a parent's failure to complete one service plan requirement is sufficient to support termination under subsection (O)."[3] *In re B.R.T.*, No. 04-22-00416-CV, 2023 WL 29381, at *2 (Tex. App.—San Antonio Jan. 4, 2023, no pet.).

In its temporary orders, the trial court ordered C.R.Y.B. to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The service plan required C.R.Y.B. to: (1) obtain and maintain legal employment and housing to provide the children with a safe, stable, home environment free of domestic violence and drugs; (2) engage in and complete parenting awareness and drug risk education parenting classes; (3) complete a drug assessment and follow all recommendations in the assessment including inpatient treatment; (4) submit to random drug tests and hair follicle tests as requested by the Department caseworker; (5) engage in and complete a domestic violence class for victims; (6) participate in individual therapy to discuss, among other things,

---

[3]Termination under subsection (O) is precluded if a parent proves, by a preponderance of the evidence, that: (1) she was unable to comply with specific provisions of a court-ordered service plan, and (2) she made a good faith effort to comply and her failure to comply was not attributable to any fault of her own. TEX. FAM. CODE § 161.001(d). On appeal, C.R.Y.B. does not argue she satisfied the requirements of section 161.001(d).

the reasons for the Department's involvement, C.R.Y.B.'s parenting abilities, her past and present relationships and incidents of domestic violence, her past and present drug use, and her support system; and (7) participate in a mental health assessment and abide by all recommendations.

The evidence showed that C.R.Y.B. did not provide proof of legal employment and stable housing; did not complete parenting classes; did not complete the inpatient drug treatment; did not submit to all random drug tests as requested by the Department caseworker; did not complete the required domestic violence classes; did not complete a domestic violence class; and did not participate in a mental health assessment. After reviewing the evidence under the appropriate standards of review, we conclude that the factfinder could reasonably have formed a firm belief or conviction that C.R.Y.B. failed to comply with the terms of her court-ordered service plan in violation of subsection (O). *See In re E.G.K.*, 2023 WL 2777510, at \*4; *In re B.R.T.*, 2023 WL 29381, at \*2. The evidence is therefore legally and factually sufficient to support termination under subsection (O).

**Subsection (P) Finding—Use of Controlled Substance in Endangering Manner**

In her third issue, C.R.Y.B. argues the evidence is legally and factually insufficient to support the trial court's finding that she used a controlled substance in a manner that endangered the children's health or safety as required under subsection (P). *See* TEX. FAM. CODE § 161.001(b)(1)(P). Under subsection (P), a trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program. *Id*.

C.R.Y.B. does not challenge the sufficiency of the evidence showing she used a controlled substance and failed to complete a court-ordered substance abuse treatment program. She only challenges the sufficiency of the evidence showing her illegal drug use endangered the children's health or safety. C.R.Y.B. acknowledges the children's hair follicle tests were positive for methamphetamine, but she contends this evidence does not demonstrate endangerment because Ramirez testified that the children's exposure to methamphetamine did not require any medical intervention. C.R.Y.B. also emphasizes that her only positive drug test occurred after the children were removed from her care.

The Texas Supreme Court has explained that subsection (P) does not "require[] direct evidence that [a parent's] drug use resulted in physical injury to [her] children." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). "While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child[ren] can establish a substantial *risk* of harm." *Id.* (emphasis in original). "A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* at 278. For example, a parent's "continued lack of housing and ability to support [her] children exemplify risks that a pattern of drug use can create." *Id.* at 279. "A court need not require physical injury from these risks to materialize to find that the children's health and safety have been endangered by them; a pattern of illegal drug use in such a context is evidence from which a factfinder may infer endangerment." *Id.* "A parent's pattern of illegal use of a controlled substance like methamphetamine supports a finding of endangerment under (P) when the evidence shows it

adversely affected the parent's ability to parent, presenting a substantial risk of harm to the child[ren]'s health and safety." *Id*. at 281.

Here, the evidence showed that before the termination suit was filed, C.R.Y.B. admitted to using illegal drugs. After the termination suit was filed, C.R.Y.B. repeatedly refused to submit drug testing. A parent's "failure to drug test is considered a positive test result under the law and supports an inference that she is still using drugs." *In re M.M.*, No. 04-21-00463-CV, 2022 WL 1096381, at *4 (Tex. App.—San Antonio Apr. 13, 2022, no pet.); *see also In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (noting the trial court "could have reasonably inferred that [parent's] failure to appear for drug testing indicated that [she] was avoiding testing because [she] was using drugs."). And, the only time C.R.Y.B. did submit to drug testing, the results were positive for amphetamine, methamphetamine, and cocaine. Based on the evidence, the factfinder could have reasonably inferred that C.R.Y.B. engaged in a pattern of illegal drug use. *See In re R.R.A.*, 687 S.W.3d at 281 (recognizing parent's "positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop[ed] [his] continued pattern of drug use.").

Additionally, there was evidence from which the factfinder could have reasonably inferred that C.R.Y.B.'s pattern of illegal drug use adversely affected her ability to parent, presenting a substantial risk to the children's health or safety. *See id*. at 278. Before the children's removal, C.R.Y.B. admitted the children were exposed to severe domestic violence. Nevertheless, C.R.Y.B. failed to protect the children by following a family safety plan. C.R.Y.B. refused a caseworker's assistance in going to a homeless shelter. When the children were removed from C.R.Y.B.'s care, they smelled like urine and had not been bathed. Torres testified

that when the children were removed, C.R.Y.B. did not have any money for diapers. Plus, C.R.Y.B. was not providing the children with medical and dental care. Based on the close temporal relationship between C.R.Y.B.'s conduct and her illegal drug use, the factfinder could reasonably infer that C.R.Y.B.'s difficulties in caring for her two small children were related to her illegal drug use. *See id*. at 279 (noting, when close temporal relationship existed, factfinder could infer father's difficulties in finding shelter and support for his children were related to his illegal drug use).

After reviewing all the evidence under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that C.R.Y.B. used a controlled substance in a manner that endangered the children's health and safety. The evidence is therefore legally and factually sufficient to support the trial court's termination of C.R.Y.B.'s parental rights under subsection (P). *See* TEX. FAM. CODE § 161.001(b)(1)(P); *In re S.Q.-M.B.*, No. 04-24-00296-CV, 2024 WL 3882144, at *3 (Tex. App.—San Antonio Aug. 21, 2024, no pet.) (overruling mother's legal and factual sufficiency challenge under subsection (P) when evidence showed she was using methamphetamine while the children were in her care).

### BEST INTEREST OF THE CHILDREN

In her fourth issue, C.R.Y.B. argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children. Specifically, C.R.Y.B. argues her parental abilities were demonstrated by her substantial efforts to comply with the service plan. She further argues the Department presented no evidence that the children had been or were likely to be negatively affected by her actions.

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the

child's parent is willing and able to provide the child with a safe environment, a factfinder may consider the relevant factors set out in section 263.307. *See* TEX. FAM. CODE § 263.307(b).[4] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The Holley factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see In re E.A.R.*, 672 S.W.3d 716, 722 (Tex. App.—San Antonio 2023, pet. denied) (noting that a best-interest finding does not require proof of any particular factor). "Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re E.A.R.*, 672 S.W.3d at 722 (quoting *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied)). Finally, in determining whether termination of

---

[4]These factors include (1) the children's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the children; (4) whether the children have been victims of repeated harm after the initial report and intervention by the Department; (5) whether the children are fearful of living in or returning to their home; (6) the results of psychiatric, psychological, or developmental evaluations of the children, their parents, other family members, or others who have access to the children's home; (7) whether there is a history of abusive or assaultive conduct by the children's family or others who have access to their home; (8) whether there is a history of substance abuse by the children's family or others who have access to their home; (9) whether the perpetrator of the harm to the children is identified; (10) the willingness and ability of the children's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the children's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the children's family demonstrates adequate parenting skills, including providing the children and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the children's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the children; and (F) an understanding of the children's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the children. TEX. FAM. CODE § 263.307(b).

[5]These factors include, but are not limited to, the following: (1) the children's desires; (2) the children's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the children; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the children's best interest; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *In re E.A.R.*, 672 S.W.3d at 722; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

Here, the trial court terminated C.R.Y.B.'s parental rights on predicate grounds of constructive abandonment, failure to complete the services in a court-ordered service plan, and using a controlled substance in a manner that endangered the children's health or safety and failing to complete a court-ordered substance abuse treatment program. We previously determined that the evidence is legally and factually sufficient to support each of these predicate grounds. Thus, the same evidence presented to support these predicate grounds is also probative of the children's best interest. *See In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

Based on C.R.Y.B.'s multiple acts and omissions, the factfinder could have reasonably determined that her relationship with the children was not a proper one. Before removal, the children were exposed to illegal drug use. "A parent's exposure of children to drug use may be properly considered in determining whether a parent demonstrates appropriate parenting abilities." *In re O.N.V.*, No. 12-24-00214-CV, 2024 WL 4002387, at *4 (Tex. App.—Tyler Aug. 29, 2024, pet. filed). Before removal, the children were exposed to severe domestic violence; after removal, C.R.Y.B. did not complete a domestic violence course. A history of domestic violence and the failure to take a domestic violence course or engage in a domestic violence program supports a best-interest finding. *In re M.C.L.*, No. 04-21-00276-CV, 2022 WL 218998, at *6 (Tex. App.—San Antonio Jan. 26, 2022, no pet.). When the children were in her care, C.R.Y.B. was not taking care of their basic needs. They were not receiving medical and dental

care. *See In re J.H.*, No. 07-21-00059-CV, 2021 WL 2693284, at *3 (Tex. App.—Amarillo June 30, 2021, pet. denied) (concluding parent's failure to ensure children received medical care was relevant to the best-interest analysis because children's "basic needs include medical care"). And, at removal, the children smelled like urine and had not been bathed.

Several weeks after the children's removal, C.R.Y.B. tested positive for amphetamine, methamphetamine, and cocaine. Thereafter, C.R.Y.B. repeatedly refused to submit to drug testing, which supported an inference that she was continuing to engage in illegal drug use. "Evidence that a parent continued to use illegal drugs even though the parent knew her parental rights were at risk is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature endangers a child's well-being." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (citations omitted)).

The overwhelming evidence showed that C.R.Y.B. was unwilling or unable to provide the children, who were very young and vulnerable, with a safe, stable environment. C.R.Y.B. did not obtain and maintain housing as required by the service plan. Additionally, the factfinder could have reasonably determined C.R.Y.B.'s failure to engage in and complete the services in her service plan showed her uncooperativeness and unwillingness to effectuate the personal changes necessary to obtain the children's return. *See In re M.R.J.M.*, 280 S.W.3d 494, 506, 510 (Tex. App.—Fort Worth 2009, no pet.) (noting father's failure to effect personal and environmental changes until immediately before trial supported best-interest finding); *In re J.I.T.P.*, 99 S.W.3d 841, 847 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering parent's uncooperativeness and failure to complete counseling services in reviewing sufficiency of best-interest finding); *see also* TEX. FAM. CODE § 263.307(b)(11) (recognizing willingness and ability of parent to effect positive environmental and personal changes within a reasonable

period of time is relevant to determining whether parent is willing and able to provide the child with a safe environment).

By contrast, the evidence showed the Department was providing each child with a safe, stable environment. By the time of trial, N.N.Y.B. was two and a half years old, and L.L.Y.B. was five years old. N.N.Y.B. was living with his paternal grandmother. L.L.Y.B. was living in a foster home. Although L.L.Y.B. was not in a foster-to-adopt home, L.L.Y.B. would be able to remain there until a foster-to-adopt home was found for him. The evidence also showed that L.L.Y.B. had special needs and required a high level of care, which his foster mother was able to provide. Diagnosed with autism spectrum disorder, L.L.Y.B. was generally nonverbal. However, by the time of trial, L.L.Y.B had learned some words and sign language. L.L.Y.B. was receiving speech therapy and occupational therapy and was receiving medical care from both a primary care physician and a developmental pediatrician. Additionally, L.L.Y.B. had recently learned to use a utensil to eat and he was in the process of potty-training. Although living in different homes, L.L.Y.B. and N.N.Y.B. had sibling visits every month. The children's caregivers were committed to continuing these visits.

Based on the totality of the evidence, the factfinder could have reasonably found that C.R.Y.B. was unable or unwilling to meet the children's emotional or physical needs now and in the future, and that she posed an emotional and physical danger to them now and in the future. After reviewing the evidence under the appropriate standards of review, we conclude the factfinder could reasonably have formed a firm belief or conviction that termination of C.R.Y.B.'s parental rights was in the best interest of the children. The evidence is therefore legally and factually sufficient to support the trial court's best-interest finding.

## CONSERVATORSHIP

In her fifth issue, C.R.Y.B. argues that in the event we reverse part of the judgment terminating her parental rights, we should also reverse the part of the judgment appointing the Department the children's managing conservator. However, earlier in this opinion we concluded the trial court did not err in terminating C.R.Y.B.'s parental rights. Accordingly, C.R.Y.B. cannot challenge the part of the judgment appointing the Department the children's managing conservator. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *7 (Tex. App.—San Antonio June 24, 2020, pet. denied) (concluding mother's conservatorship argument had no merit because appellate court had already determined the trial court did not err in terminating mother's parental rights); *In re L.T.P.*, No. 04-17-00094-CV, 2017 WL 3430894, at * 6 (Tex. App.—San Antonio Aug. 9, 2017, pet. denied) (holding that because the trial court did not err in terminating appellant's rights, appellant no longer had any legal rights to her children and could not challenge the portion of the termination order that related to the appointment of conservators).

## INEFFECTIVE ASSISTANCE OF COUNSEL

In her sixth issue, C.R.Y.B. argues the termination must be reversed because she received ineffective assistance of counsel. To successfully raise an ineffective assistance of counsel claim in a parental-termination case, a parent must meet the United States Supreme Court's two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021). Under that standard, a parent appealing a termination order must show by a preponderance of the evidence that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) the parent was prejudiced by trial counsel's defective performance. *In re J.A.B.*, 562 S.W.3d 726, 729 (Tex. App.—San Antonio 2018, pet. denied)

(citing *Strickland*, 466 U.S. at 687). "A failure to establish either prong of the *Strickland* test is fatal to an ineffective assistance claim." *In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *2 (Tex. App.—San Antonio Aug. 3, 2022, no pet.).

In determining whether counsel's performance fell below an objective standard of reasonableness, we give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *In re J.M.O.*, 459 S.W.3d 90, 93 (Tex. App.—San Antonio 2014, no pet.). We take into account all of the circumstances surrounding the case, and primarily focus on whether counsel performed in a reasonably effective manner. *Id.* "It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it,' that the challenged conduct will constitute ineffective assistance." *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "[T]o show prejudice, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *In re J.M.O.*, 459 S.W.3d at 94 (citation omitted); *see Strickland*, 466 U.S at 694.

"[I]neffective assistance of counsel claims must be firmly founded in the record, and the record must affirmatively show the alleged ineffectiveness." *In re D.J.R.*, No. 04-23-00568-CV, 2023 WL 8246666, at *8 (Tex. App.—San Antonio Nov. 29, 2023, no pet.). "We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions." *In re F.L.H. IV*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (quoting *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

**Deficient Performance**

With respect to the first prong of the *Strickland* test—counsel's allegedly deficient performance—C.R.Y.B. complains about (1) counsel's nonappearance at pretrial permanency hearings, (2) counsel's uncertainty about C.R.Y.B.'s service or appearance status during announcements immediately prior to trial, (3) counsel's failure to cross-examine one witness at trial, (4) counsel's failure to object to the admission of C.R.Y.B.'s drug test results at trial, and (5) counsel's failure to make a closing argument at trial.

We begin by considering C.R.Y.B.'s complaint about counsel's failure to object to the admission of her drug test results. "When a party claims ineffective assistance of counsel for failing to object, the party must demonstrate that the trial court would have committed error in refusing to sustain the objection if counsel had objected." *In re M.A.C.*, No. 05-22-01262-CV, 2023 WL 3267867, at *12 (Tex. App.—Dallas May 5, 2023, pet. denied). Here, C.R.Y.B. does not explain why the drug test results, which were accompanied by a business records affidavit, were inadmissible and what objection should have been made. *See In re S.W.W.*, 14-22-00503-CV, 2022 WL 17982904, at *7-8 (Tex. App.—Houston [14th Dist.] Dec. 29, 2022, pet. denied) (holding trial court did not abuse its discretion in admitting drug test results in a parental termination case when they were accompanied by a business records affidavit that complied with evidentiary rules and showed sufficient indicia of trustworthiness). Thus, C.R.Y.B. has not demonstrated that by failing to object to the drug test results, counsel's performance fell below an objective standard of reasonableness. *See In re M.A.C.*, 2023 WL 3267867, at *12.

Next, we turn to C.R.Y.B.'s other complaints about counsel's performance. First, the clerk's record appears to indicate that counsel did not appear at the permanency hearings which took place before trial. However, the record is silent about the reason counsel did not appear at

these hearings and we are not permitted to speculate about the reason for his actions. *See In re F.L.H. IV*, 2017 WL 6597829, at *15. Second, during announcements, counsel expressed uncertainty about whether C.R.Y.B. had been served or had appeared in the case. But the record is silent regarding counsel's reason for counsel's uncertainty, and we are not permitted to speculate about the reason. *See id*. Third, while counsel did not cross-examine the Department's first witness, he did cross-examine its second witness. Again, the record is silent about the reason counsel did not cross-examine the witness and we cannot speculate about the reason. *See id*. Finally, although the record shows counsel chose not to make a closing argument, the record is silent about the reason for this decision and we cannot speculate about the reason. *See id*. In sum, after considering C.R.Y.B.'s complaints about counsel's conduct, we conclude she has not demonstrated that the complained-of conduct was so outrageous that no competent attorney would have engaged in it. *See In re M.S.*, 115 S.W.3d at 545. Thus, C.R.Y.B. has not established that counsel's performance fell below an objective standard of reasonableness. *See In re M.A.C.*, 2023 WL 3267867, at *12.

**Prejudice**

With respect to the second prong of the *Strickland* test—prejudice—C.R.Y.B. does not argue, much less show, that but for the complained-of conduct, her parental rights would not have been terminated. *See In re C.D.L.*, No. 04-23-00105-CV, 2024 WL 3349099, at *13 (Tex. App.—San Antonio July 10, 2024, no pet.) (overruling parent's ineffective assistance of counsel claim when parent made no showing that had counsel not committed the alleged unprofessional errors, the result of the termination trial would have been different); *In re A.M.R.*, 652 S.W.3d 117, 129 (Tex. App.—Waco 2022, pet. denied) (overruling ineffective assistance of counsel claim when parent failed to show that but for the alleged error by appointed counsel, the result of

the proceeding would have been different). Thus, C.R.Y.B. has not made the required showing of prejudice.

Because C.R.Y.B. failed to establish both prongs of the *Strickland* test, we conclude she has not established her ineffective assistance of counsel claim. *See In re J.R.R.*, 2022 WL 3047099, at *2.

## CONCLUSION

The trial court's judgment is affirmed.

Liza A. Rodriguez, Justice